In re Stefan Victor POPESCU, Debtor.

**METROPOLITAN LIFE INSURANCE COMPANY, Plaintiff,**

v.

Stefan POPESCU and Atlanta Intercontinental, Inc., Defendants.

Bankruptcy No. 91–77399–JB.
Adv. No. 94–6304.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

July 26, 1994.

Mitchell S. Rosen, Rowe, Foltz & Martin, Atlanta, GA, for plaintiff.

William L. Rothschild, Branch, Pike & Ganz, Atlanta, GA, for defendants.

Richard D. Ellenberg, Chapter 11 Trustee, Ellenberg & Associates, P.C., Atlanta, GA.

## ORDER

JOYCE BIHARY, Bankruptcy Judge.

This adversary proceeding is before the Court on the plaintiff's motion for a preliminary injunction. Plaintiff seeks to enjoin the defendants from erecting a fence or any form or manner of barricade on the debtor's property which would prevent traffic from crossing debtor's property when going from one portion of plaintiff's property to another por-

tion of plaintiff's property. After considering the evidence and arguments presented, the Court concludes that the motion for preliminary injunctive relief should be denied.

The plaintiff is Metropolitan Life Insurance Company ("Met Life"). There are two named defendants, the debtor, Mr. Stefan Popescu, and Atlanta Intercontinental, Inc. Atlanta Intercontinental, Inc. leases real property from the debtor on Roswell Road on which it operates a restaurant called the Boston Sea Party. Met Life has a shopping center on its property known as Powers Ferry Square Shopping Center ("shopping center") which abuts debtor's property on Roswell Road. Atlanta Intercontinental, Inc. is owned by the debtor's son, Adrian Popescu.

Met Life asserts that it has a prescriptive easement over a small portion of debtor's property under O.C.G.A. § 44–9–54. This statute provides that whenever a private way has been in constant and uninterrupted use for seven or more years and no legal steps have been taken to abolish it, it shall not be lawful for anyone to interfere with that private way. Defendants contend there is no prescriptive easement and that plaintiff is trespassing.

Specifically, Met Life claims that trucks and cars have used this portion of debtor's property to get from the main lot of the shopping center to the north lot of the shopping center for the past seven years. Met Life claims that this use has been continuous and uninterrupted.

Defendants strongly dispute these contentions. Debtor contends that his property was not used as a private way and that it was not part of the path used by vehicles going from the main lot to the north lot of the shopping center until 1994 when Met Life leased space to Harry's in a Hurry ("Harry's"). Debtor contends that at least up until 1991, the only traffic going to the north lot consisted of a few delivery trucks; that one lane was sufficient for the small amount of traffic and that the trucks would have used the path solely on Met Life's property. To support their position, defendants point to

the painted line markings that were on the pavement prior to January or February of 1994. Debtor argues that these line markings clearly were intended to and did divert traffic away from the disputed portion of debtor's property such that ordinary traffic would have flowed from the main lot to the north lot solely on Met Life's property.

Defendants have threatened to erect a fence on debtor's property which would prevent the use of this portion of debtor's property for traffic going from the main parking lot of the shopping center to the north lot of the shopping center. Plaintiff seeks a preliminary injunction to stop defendants from erecting a fence. The Court held a hearing on the motion for a preliminary injunction on June 2 and 3, 1994. The parties have filed a number of briefs.[1] On June 16, 1994, the Court made an on-site visit to the property at issue. On July 19, 1994, counsel provided the Court with certain measurements requested by the Court.

The criteria for obtaining preliminary injunctive relief are: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a showing that plaintiff will suffer irreparable injury if an injunction does not issue, (3) proof that the threatened injury to plaintiff outweighs any harm that might result to the defendants, and (4) a showing that the public interest will not be disserved by grant of a preliminary injunction. The preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion as to the four prerequisites. (*Snook v. Trust Co. of Georgia Bank of Savannah*, 909 F.2d 480, 483 (11th Cir.1990) (*citing Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1284 (11th Cir.1990); *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir.1983); *Canal Authority of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir.1974)).

The pertinent facts are as follows. Met Life leased space in the shopping center

---

1. Met Life has objected to an exhibit attached to defendant's letter brief dated June 7, 1994 and has requested that it not be considered. Met Life's objections are valid, and the Court has not considered the exhibit attached to the June 7, 1994 letter brief in reaching its decision.

to Harry's in 1994. Harry's opened its store on one corner of the shopping center on or around March 1, 1994. Prior to Harry's, the tenant in that corner space was a fabric store which went into bankruptcy. Met Life and Harry's made certain improvements to the corner space and the parking lot in early 1994 to accommodate Harry's. The entrance to the corner space was relocated from the side that faces the main parking lot to the side that faces the north parking lot of the shopping center. The sidewalk was extended around the corner and raised. Harry's placed signage on the turn that affects a driver's view of oncoming traffic. Met Life painted new lines over its property and lines over debtor's property to direct two lanes of traffic from the main lot to the north lot. The lane directing traffic into Harry's and the north lot is 10'10" wide and flows over property titled in the debtor's name. The dimensions of the debtor's property at issue are 16'4" by 15'5" by 22'5". The lane directing traffic out of Harry's and out of the north lot is 14'6" wide and flows exclusively over Met Life's property. The center line between these two lanes is over the iron pin that denotes the boundary line between debtor's property and Met Life's property.

Met Life or its predecessors paved this portion of debtor's property back in 1986 and again in 1990. Defendants do not dispute that Met Life paved the disputed area, but defendants dispute that plaintiff used the property continuously for ingress and egress for seven years.

The Court heard the testimony of two witnesses regarding prior usage over the seven year period.[2] Adrian Popescu, owner of the Boston Sea Party restaurant, testified that he has been on the property on a daily basis since May of 1988; that he has had an opportunity on a daily basis to witness what goes on in the southwest corner of his property; that the markings for two lanes, one going in and one going out to Harry's were painted in January or early February of 1994; and that the previous markings on the pavement only directed the traffic into the

north lot and there was no southerly signage. He testified that prior to 1991, no more than 20 vehicles a day travelled back to Met Life's north lot and that none of the vehicles crossed over onto debtor's property during that time.

Joe Jordan, the owner of Cato Shoe Repair, testified. Cato's has been a tenant in the shopping center since September, 1986. From the back door of Cato's, Mr. Jordan can see the Boston Sea Party and Harry's. Mr. Jordan testified that since 1986, he has seen vehicles go in and out of the north parking lot. On direct examination, he testified that he recalls vehicles traveling over the disputed portion of debtor's property since 1986. However, on cross examination, Mr. Jordan testified that when he saw cars going from the main lot to the north lot, he could not tell how close they were to what is now the Harry's store. Mr. Jordan testified that back in 1987, he saw less than ten trucks a day going from the main lot back to the north parking lot.

In 1990 or 1991, postal employees began using the north parking lot. Met Life argues that the parking by postal workers in the north lot would have generated sufficient traffic to have required two lanes of driving from the center lot to the north lot and that if two lanes were required and used, cars necessarily would have gone over debtor's property. There are two problems with the argument. First, no postal worker parking occurred until 1990 or 1991, and Georgia law requires seven years of continuous use. Second, the line markings on the pavement that existed before 1994 suggest that there was not a path for cars which crossed debtor's property when going from the main lot to the north lot.

A key question is whether delivery trucks or cars which went from the main lot to the north lot in 1987–1994 travelled along a path that included debtor's property. The Court inspected the property and observed the line markings in the pavement which existed be-

**2.** McLendon Rafeedie, a property manager of the shopping center, testified on behalf of the plaintiff, but Mr. Rafeedie only became involved with the property professionally in July of 1990 and thus had no knowledge of the usage prior to July of 1990.

fore the construction of Harry's.[3] While these lines have been painted over, the old markings are visible. The prior markings on Met Life's property allocated parking spaces in two relevant sections and included a striped area next to one of the parking areas. From the markings, the Court concludes that traffic would not have travelled over debtor's property if cars were parked in the places clearly marked and provided for that purpose. Even if cars were not parked in these marked places, these lines in the pavement had some meaning, and the ordinary driver would observe the traffic flow indicated by the markings on the pavement. The markings on the pavement that back up to the fence and the boundary line are particularly compelling. These line markings would have diverted ordinary traffic away from debtor's property.

There is evidence that in 1986, Met Life's predecessor removed a portion of a wire fence which marked the boundary and separated Met Life's property from the portion of debtor's property that is now in dispute. As previously noted, it is undisputed that Met Life paved this portion of debtor's property. However, it does not follow from the removal of the fence and the paving that this area was to be used for vehicles to travel back and forth from the north lot. Once again, after a visual inspection of the property and the line markings on the portions of Met Life's property which are located on either side of the disputed property, it does not appear likely that the disputed area was part of a path used for ingress and egress.

Met Life disputes whether the sidewalk expansion for Harry's pushed cars onto the debtor's property. While the evidence is insufficient to make a precise finding on this issue, the Court notes that Met Life's argument actually supports debtor's general argument regarding the significance of the prior line markings on the pavement. Met Life argues that before the sidewalk was expanded on the north end of the shopping center, there were parking spaces perpendicular to the north end wall. Met Life argues that this expansion merely took the place of these parking spaces, stating: "Since it is reasonable to assume that these spaces were used at least some of the time by people to park their cars, it is also reasonable to assume that cars traveling from the north lot to the main lot steered around these cars." *See* Met Life's Supplemental Post–Trial Memorandum, filed on June 21, 1994, at 5. This is precisely the debtor's argument with respect to the marked parking spaces in the other two areas of Met Life's property that border debtor's property. It is reasonable to assume that those spaces were used at least some of the time by people to park their cars, and it is reasonable to assume that cars traveling would steer around these parked cars. In addition, the elevation and addition of the sidewalk to Harry's appeared more substantial to the Court from the on-site visit than what it appeared to be from the oral testimony in the courtroom. How much this addition affected traffic is difficult to tell, but Mr. Rafeedie's testimony that the construction of these improvements made Met Life's need to use debtor's property more critical is very credible.

All of the witnesses testified that traffic from the main lot to the north lot of Met Life's property has increased since the Harry's store opened. Mr. Rafeedie thinks the traffic has doubled or tripled; Mr. Jordan estimates traffic has doubled, and Mr. Popescu testified that in a one-hour period from 6:00 to 7:00 p.m. on Tuesday, May 31, 1994, he counted 120 cars crossing debtor's property. While none of the witnesses has conducted any scientific survey regarding the increase in traffic, it is undisputed that the vehicular traffic from the main lot to the north lot of Met Life's property has increased since Harry's opened in 1994.

■ Considering the facts stated above, the Court concludes that plaintiff has not shown a likelihood that it will succeed on the claim that Met Life has established a private

---

**3.** This written opinion would be clearer if it included a diagram. Unfortunately, the parties did not present a stipulated diagram of the property with the pavement markings before the construction of the Harry's store, and the Court's findings are based on oral testimony, photographic exhibits of different portions of the area involved, and the Court's on-site inspection of the property.

way on debtor's property by prescription. In Georgia, the acquisition of a private way, i.e., a right of ingress and egress over the land of another by prescription, rests upon a unique statutory foundation. 1 George A. Pindar and Georgine S. Pindar, *Georgia Real Estate Law and Procedure*, § 8–11, at 414 (4th ed. 1993). O.C.G.A. § 44–9–54 provides as follows:

> **Establishment of private way by prescription—Generally.**
>
> Whenever a private way has been in constant and uninterrupted use for seven or more years and no legal steps have been taken to abolish it, it shall not be lawful for anyone to interfere with that private way.

Prescription is to be strictly construed. *First Christian Church at Macon, Georgia v. Realty Inv. Co.*, 180 Ga. 35, 178 S.E. 303 (1934). One of the requirements is that the use be continued along the same route without shifting from one path to another. *Short v. Walton*, 61 Ga. 29, 31 (1878); *Childers v. Holloway*, 69 Ga. 757 (1882); *Follendore v. Thomas*, 93 Ga. 300, 20 S.E. 329 (1894); *Peters v. Little*, 95 Ga. 151, 152, 22 S.E. 44 (1894); *Buchanan v. Parks*, 111 Ga. 873, 36 S.E. 947 (1900).

Here, the path that was marked in 1994 as a two-lane ingress and egress to accommodate the increased traffic for Harry's is wider and different than the path that was used over the past seven years. The previous markings on the pavement are the best evidence of the former path. Those markings show that normal traffic would have used a narrower path than the path now sought by Met Life. There is no evidence that the property at issue was marked for two lanes of traffic before January or February, 1994. The testimony regarding the amount of traffic that took place prior to Met Life's leasing the space to Harry's suggested there was no need for two lanes of traffic. Finally, the fact that people used the north lot of Met Life's property does not mean that they travelled over debtor's property to get there. This is not a case where the only means of getting from the main lot to the north lot of Met Life's property is over debtor's property. The area is such that there was room for a full lane of traffic going solely over Met Life's property, and, as previously stated, the prior paint markings on the pavement directed traffic onto that single lane.

Met Life argues that even if the private way has changed, small deviations and detours, within reason, do not bar the creation of a prescriptive easement. Met Life cites two cases for that proposition, *Scarboro v. Edenfield*, 58 Ga.App. 619, 199 S.E. 325 (1938) and *Cook v. Wimpey*, 57 Ga.App. 338, 195 S.E. 325 (1938). Neither case supports Met Life's claim. In *Scarboro*, while evidence showed that some detours were made from the original road, there was testimony that at all times the original road was used. More importantly, the action did not involve a claim to use an area encompassing the detours, but only involved a claim to use the original road. The court there did not allow a prescriptive right over the detours. In *Cook v. Wimpey*, the court held that a permissive change of the private way did not defeat title by prescription to a private way. Here, the facts do not support the establishment of a private way followed by a permissive change of the private way.

Met Life's property manager was surprised by the location of the boundary line between debtor's and Met Life's property. Mr. Rafeedie credibly testified that he thought the portion of the debtor's property at issue was Met Life's property up until 1994, when Adrian Popescu notified Mr. Rafeedie of the problem. Mr. Popescu testified that he notified Mr. Rafeedie of this matter on February 16, 1994, approximately two weeks before the Harry's store opened. These facts do not affect the Court's ruling. There is no evidence to support any finding that the debtor or the defendants misled Met Life into building a traffic lane over the debtor's property. In fact, Adrian Popescu testified he was unaware of the location of the iron pin until January, 1994, because it had been asphalted over by Met Life in 1991. Finally, there was a site plan of the property prepared in March of 1990 available to Met Life that clearly showed the boundary between the two properties.

Since plaintiff has failed to show a likelihood of prevailing on the merits, the Court need not decide whether plaintiff has carried

its burden of persuasion on the other three prerequisites for granting injunctive relief.[4] Similarly, the Court does not reach the two arguments raised by the defendants that (1) assuming Met Life acquired a private way over debtor's property, the easement would not extend to the current increased use; and (2) assuming the facts support the acquisition of a private way outside of bankruptcy, the filing of bankruptcy and the operation of § 362(a) of the Bankruptcy Code prevent the post-petition transfer of a property interest.

Met Life argues that debtor's motives are wrong, that debtor has no intention of really building a fence, and that debtor only wishes to threaten to do so in order to force Met Life to pay an unreasonable amount for this small strip of property. Met Life may be correct on all of these points, but these arguments do not change the law or allow Met Life to take a portion of debtor's property. Furthermore, if Met Life believes that debtor has no intention of really erecting a fence, then Met Life does not need injunctive relief. Finally, the parties recognize that while they are free to negotiate a sale price for this piece of property and are indeed encouraged to do so, there are no facts or law with the case in its current procedural posture that would allow the Court to determine a "fair price" or to require a sale by debtor to Met Life.

In accordance with the above reasoning, plaintiff's request for a preliminary injunction is DENIED.

IT IS SO ORDERED.

---

4. Defendants appear to concede that the threatened injury to the plaintiff of the erection of a fence outweighs any harm that might result to the defendants, and the public interest would not be disserved by the granting of a preliminary injunction. Regarding the factor of irreparable harm, plaintiff offered evidence and argument to support the proposition that blocking one of the two lanes would cause traffic problems, but defendants point out that a patrolman could alleviate any danger. The erection of a fence would affect deliveries to Harry's and would undoubtedly make it more difficult to shop at Harry's in a Hurry in a hurry, thus disrupting some business. However, the damages to Harry's business are quantifiable, and plaintiff has not argued that the defendants are incapable of responding to a money judgment, although one of the two defendants has been in a Chapter 11 proceeding for some time.